[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Plaintiff, Shane Grant, brings this action seeking damages for personal injuries and defective construction against the following defendants: John Brouard individually, John Brouard D/B/A Maple Leaf, Inc.; Betty Brouard, Maple Leaf, Inc.; Morris Dibner and Morris Dibner D/B/A Blue Heron Development Co.
In response to plaintiff's complaint the defendants, in their respective answers, joined issue. Additionally the defendant, Dibner, claiming plaintiff had been unjustly enriched by his services, filed a counter claim seeking damages.
The case was tried to the court and on the first day of trial, the parties agreed and stipulated, with the court's consent, to separate plaintiff's claim of damages for personal injury from the remaining claims and, to try the latter first. After two days of trial, the case was reported settled and withdrawn against all defendants with the exception of Morris Dibner individually and D/B/A Blue Heron Development Co. (Consequently, all references hereafter to defendant will mean Morris Dibner individually and D/B/A.)
Because the pro se appearing defendant is not an attorney, it bears CT Page 1760 saying that the plaintiff has the burden of proving the material and essential elements of his claim by a fair preponderance of the evidence, if they are to be proved at all, and that the defendant has a similar burden of proof as to his counter claim.
Unfortunately, the court is of the opinion that both Grant and Dibner were, at times during their testimony, evasive and less than candid. Further, impugning their credibility, it became apparent that they knowingly made misrepresentations on several documents including Dibner on an application for the building permit and Grant, on a waiver of lien form.
From a fair preponderance of the credible evidence presented at trial, the court finds the following facts.
During the summer of 1994, the plaintiff and defendant met on the site of a single family house in Roxbury, Connecticut. Earlier, plaintiff had seen and admired the dwelling and wanted to construct a similar house on land that he owned in Woodbury but did not want to incur the expense of an architect. Consequently, he met with defendant on site in order to determine whether defendant would be able to draft plans and draw up specifications that would enable the plaintiff to substantially duplicate the dwelling.
While there is some dispute as to who solicited whom in regard to this project, it is clear that plaintiff, who knew defendant was not an architect, was aware of his drafting ability and his knowledge of construction such as would enable him to obtain building materials at a reasonable price.
Believing that he was capable of providing the necessary drawings, blue prints and site development, defendant submitted a written proposal to plaintiff that upon acceptance, on September 28, 1994, became their contract.
The contract in pertinent part provides as follows: "We hereby propose to furnish all the materials and perform all of the labor necessary for the completion of complete site development and establish design drafting and engineering. . . . full blueprint design and development to meet town requirements from permit application. All footprint and flood plans will be given to client for approval prior to final production."
It also provides that defendant was to be paid $4,200.00 "upon approval of final design format" and that the $4,200.00 was a "not to exceed figure". CT Page 1761
Defendant completed the plans during the month of December 1994 and shortly thereafter introduced plaintiff to John Brouard, whom he recommended. Brouard, a defendant in this matter until plaintiff's claims against him were settled and withdrawn, was a carpenter and former builder doing business as Maple Leaf, Inc.
After reviewing the plans and specifications for the proposed house, Brouard submitted a written proposal to plaintiff that upon acceptance, on January 20, 1995, became their contract. The contract indicated that Brouard would provide the labor to frame the 3,357 square foot dwelling, construct the front, side and rear deck and construct an additional deck for $18,000.00. The agreement also indicated that siding, roofing, installation of cabinets and interior trim would be at an additional cost to plaintiff. Further, the agreement provided that "any and all extra items beyond the above specified items, shall be indicated and approved by client prior to commencement," and that all "work [will] be completed in a workmanlike manner according to standard practices."
After the foundation was in place, Brouard proceeded to frame the dwelling. In addition and at plaintiff's request, he also roofed and sided it but did not install the cabinets or interior trim. Plaintiff hired other subcontractors to perform that work, the plumbing, heating, and electrical work.
Upon completion of his obligation under the contract, Brouard was asked by plaintiff to perform extra work for which he was to be paid an hourly rate. As part of their understanding Brouard, to be paid, was to keep track of his hours and submit itemized bills to plaintiff. From that time, Brouard considered himself plaintiff's employee.
Prior to and throughout this period of framing and construction, defendant, in addition to drawing prints for some changes, primarily provided plaintiff with various and sundry non-construction services including what defendant terms "expediting." It appears that defendant's definition of expediting included filling out and filing forms to obtain a town building permit for the proposed structure; traveling to various vendors to get the best prices on materials so as to save plaintiff money, since plaintiff purchased substantially all materials for the job; delivering and exchanging certain materials for the plaintiff and acting for the most part as a "go for". With the exceptions of automobile expense which plaintiff paid when requested, defendant never submitted a bill to plaintiff for his "expediting" and no charges beyond the contract price were even discussed. Additionally, it is clear from defendant's own testimony that less than $1,500.00 of the $4,200.00 contract price was to be allocated to the preparation of the house plans and so it would be reasonable to infer that since most of his time was spent expediting, the CT Page 1762 balance of the contract price was meant to be payment for such service. No one claims that defendant ever took part in any of the actual construction work on the premises.
During the month of June or July of 1995, Brouard, at plaintiff's request, installed three overhead doors in the basement garage. This work was performed as an "extra" for which he submitted an itemized hourly bill to the plaintiff.
While the evidence is in dispute, it appears more probable than not that defendant made the selection of the garage doors and hardware that was provided to Brouard. Both Brouard and defendant had visited the garage door vendor before defendant obtained a price quote that he brought to the plaintiff for his approval. Thereafter plaintiff went to the vendor, purchased the doors and hardware and delivered them to the job site.
Some of the hardware for one of the doors was inappropriate. After installing the door in question, Brouard informed both plaintiff and defendant that he needed additional hardware for a proper installation. Nevertheless, the door was installed and he warned plaintiff and defendant on several occasions not to use it until the proper hardware was obtained and put in place.
During the installation of that door, Brouard secured one of the two pulleys that works in conjunction with a spring and cable to reduce the force necessary to open or close it, in an unworkmanlike unsafe manner. He did this by inserting a 1 3/4 inch lag bolt or screw through a 1/16 inch flat washer and then through the 5/8 inch thick pulley he was attempting to secure and then through a wall of 5/8 inch thick sheet rock before trying to screw the remaining 7/16 of an inch portion of the lag into a wooden joist. The lag never reached a joist and quaere, if it did, whether it would have been a safe and secure installation.
Neither plaintiff nor defendant were present when Brouard installed that garage door, however, he did warn them on more than one occasion not to use it. Unfortunately, he never attempted a more secure and safe installation nor did he render the door inoperable so as to protect against inadvertent use. Thereafter, during the early part of September 1995 plaintiff had Brouard perform additional carpentry work in the house by installing interior doors. This was the last time Brouard worked on the dwelling.
On the 15th day of September, plaintiff pulled the garage door closed and was struck on the head, with considerable force, by the improperly installed pulley. Thereafter plaintiff fired defendant, blaming him, in CT Page 1763 part, for the incident.
On December 4, 1995, defendant encumbered plaintiff's title to the subject premises by filing a certificate of mechanic's lien on the Woodbury land records to secure a claim of $15,300.00. By complaint dated November 25, 1995, defendant commenced an action to foreclose the lien claiming that "under an agreement with . . . [Grant] made in 1994, by which . . . [Dibner] was to provide engineering services and building construction supervision . . . [Grant] was to pay him $4,300.00 plus expenses and additional sums for changes. . . ." The action was not pursued and was later withdrawn by the defendant.
During the winter of 1996, plaintiff moved into the house, after repairing numerous construction defects. The evidence indicates that there were many problems with the work performed by Brouard including defects in the framing, roofing and siding.
Plaintiff commenced the instant action by complaint dated September 12, 1997, seeking, inter alia, to recover damages from the defendant.
Underlying several of plaintiff's claims against the defendant is the contention that defendant was plaintiff's general contractor and as such was responsible for the faulty and unworkmanlike construction of Brouard.
As cited in a footnote by the court in Gross v. Medeiros,2000 Ct. Sup. 3673,[1] A general contractor is defined as one who contracts for the construction of an entire building or project, rather than a portion of the work. A general contractor hires subcontractors, coordinates all work, and is responsible for payment of subcontractors. Black's Law Dictionary 6th Ed. 1979 at 683.
It is clear from the facts that defendant was not plaintiff's general contractor, rather, plaintiff was a "self-contractor" that is to say, he acted as his own general contractor. He hired and terminated subcontractors; he directly negotiated their contracts with them; all bills were submitted to him and he paid them directly, and he alone purchased substantially all of the construction materials for the job. On the other hand, there is no evidence that defendant had any supervising authority over subcontractors. He hired no one and no one answered to him. He drafted the plans for the new construction, as he had agreed and he acted as an "expeditor" to keep the project moving along by finding or attempting to find the best deals on material prices for the plaintiff; by obtaining the necessary building permit, although misrepresenting himself to the town in order to do so, and by drafting new plans for the construction changes required by plaintiff, clearly, defendant was not CT Page 1764 the general contractor, rather, he was but one of the plaintiff's several subcontractors. Consequently, the only work defendant expressly or impliedly warranted to be free from defects and poor workmanship was his own and contrary to plaintiff's claims, there has been no credible evidence presented that would persuade the court that defendant's plans and specifications were defective in any way.
There was considerable evidence, however, of numerous defects in Brouard's work, as aforesaid, but defendant did not warrant Brouard's work in any manner. Such warranties would have run between plaintiff and Brouard, not plaintiff and defendant.
Further, plaintiff claims that defendant misled him to his detriment by holding himself out to be a licensed architect and engineer when he held neither license. Plaintiff also claims that as a result of this deception, defendant was hired and proceeded to perform substandard work. of course, defendant disputes these claims. A review of the competent evidence indicates that while defendant did misrepresent himself to the Woodbury building officials on the building permit application and to the title company on a waiver of lien form, plaintiff was not misled. Plaintiff knew that defendant was neither a licensed architect or engineer and he also knew that for the $4,200.00 contract price he obtained the services of a good draftsman, who, although a number of years beyond retirement age, could draw plans to substantially duplicate a desired dwelling thereby eliminating the need for plaintiff to have to purchase the plans outright or pay an architect to draw them. Plaintiff also knew that he was obtaining the services of an individual with a good understanding of construction and the construction industry who could be used to seek out and find the best deals on construction materials thereby saving him money.
Plaintiff also contends that he suffered personal injuries as a result of defendant's negligence in that he purchased tracks for the garage doors that were inappropriate; in that he failed to warn plaintiff and Brouard, who installed same, that they were inappropriate and in that he failed to supervise Brouard's installation of same. As discussed elsewhere, defendant had no supervisory duty or obligation with regard to Brouard's work and also previously indicated, defendant did arrange for plaintiff to acquire the hardware in question although unaware that the tracks for one of the doors was inappropriate. The facts indicate that Brouard was asked by plaintiff to install the door as an "extra" since their installation was not covered by their contract and this he did. Contrary to plaintiff's claims, however, neither the acquisition nor the installation of the inappropriate tracks was a substantial factor in causing the plaintiff's personal injuries and losses. Rather, it was Brouard's improper installation of a pulley that was the proximate cause CT Page 1765 of those injuries and losses.
In accord with the foregoing, the Court finds that plaintiff has failed to prove his claim, or any of them by a fair preponderance of the evidence.
Next the Court turns to the defendant's two count counterclaim.
In one count defendant contends that plaintiff breached his contract by only paying him $2,000.00 of the agreed contract price of $4,300.00. Actually, upon examination the contract price is found to be $4,200.00 and not $4,300.00 as claimed in defendant's pleadings. Nevertheless, plaintiff disputes defendant's claim and testified that he paid defendant in full. Its interesting to note that defendant, in his counter claim admits being paid $2,000.00, yet he testified at trial that he received less than that amount toward the contract price.
In count two of his counterclaim, defendant alleges that plaintiff was unjustly enriched by his services.
The elements of unjust enrichment are well established and as they apply to the instant case, defendant seeking recovery must prove by a fair preponderance of the evidence (1) that the plaintiff was benefitted, (2) that the plaintiff unjustly did not pay the defendant for the benefit, and (3) that the failure of payment was to the defendant's detriment,Bolmer v. Kocent, 6 Conn. App. 595, 612-13.
Again, it is interesting to note that defendant sets out the value of his services at $36,000.00 in his counterclaim yet he earlier claimed, in his mechanics lien, that they were worth $15,300.00. In his post trial brief he claimed that his services were worth $40,200.00 and with the addition of interest had a total value of $76,380.00.
Suffice it to say that the court finds that defendant failed to prove either count of his counterclaim by a fair preponderance of the evidence.
In accordance with the foregoing, judgment will enter for the defendant, Dibner on the plaintiff's complaint and judgment will enter for the plaintiff, Grant on the defendant's counterclaim.
THOMAS G. WEST, J.